551 F.2d 1370
 CITY OF MIAMI BEACH, Plaintiff,
v.
W. J. SMITH, Jr., as Managing Trustee of Cameron-Brown
Investment Group, et al., Defendants-Appellees,
S. P. J., Inc., Wellington Industries, Inc., Jerome H. Elson
and Susan Elson, Intervenors-Appellants.
 No. 74-3258.
 United States Court of Appeals,
Fifth Circuit.
 May 16, 1977.
 
 Marion E. Sibley, Robert C. Ward, Miami Beach, Fla., for intervenors-appellants.
 Burnett Roth, Miami Beach, Fla., James J. Kenny, Miami, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before BROWN, Chief Judge, and RIVES and GEE, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 By our decision today we hope we conclude, in federal courts at least, a long-standing dispute among business partners, lenders and municipal authorities over a tract of land in Miami Beach. The district court's order authorized withdrawal by Cameron-Brown of a sum exceeding five million dollars deposited in the registry of the court pursuant to a condemnation award. Finding ourselves in agreement with the district court that any remaining dispute should be determined in some proceeding other than this eminent domain action, we affirm.
 
 
 2
 We will summarize the facts as briefly as possible. In 1967, appellants Jerome and Susan Elson (Elsons) were the sole shareholders of S.P.J., Inc., which in turn owned beachfront property in Miami Beach. The Elsons wished to develop this property and to acquire adjacent tracts for development but were unable to obtain financing. Accordingly, they entered into an agreement with Lee Ratner and Joel S. Ratner (Ratners) which, when consummated and coupled with mesne transactions and further agreements, resulted in the Ratners' purchase of the adjacent tracts and promises to provide financing. The Elsons transferred half of the stock in S.P.J., Inc. to the Ratners and received half of the stock in Wellington Industries, Inc., the Ratners' corporation. Taking title to the adjacent tracts in Wellington's name, the Elsons and Ratners agreed to treat all the tracts which we will call the "Brittany Bay property" as one site. The Elsons and Ratners thus owned equal interests in the two corporations and indirectly in the property itself.
 
 
 3
 Various other terms of the agreements relating to the readying of the site for construction[1] were carried out and a mortgage was arranged, the Ratners and the Elsons personally guaranteeing the mortgage. Failure to make payments[2] resulted in the institution of foreclosure proceedings, but the property was saved when the Ratners negotiated a new first mortgage with Cameron-Brown in the amount of $1,600,000, personally guaranteed by the Ratners and Jerome Elson. In 1971, however, this mortgage also fell into default,[3] and Cameron-Brown instituted foreclosure proceedings. In January of 1972, foreclosure was ordered by a state court. While the appeals of Wellington and S.P.J. were pending, Cameron-Brown's trustee bought in the property at the foreclosure sale.
 
 
 4
 On June 8, 1972, an agreement was reached among the Elsons, Cameron-Brown and the two corporations. Pursuant to this agreement Wellington and S.P.J. dismissed their appeals from the foreclosure order, and Susan Elson was given an option to purchase the property from Cameron-Brown for $2,000,000 on or before October 31, 1972.[4] Paragraphs 2 and 4.1.a. of the June 8 agreement read, in pertinent part, as follows:
 
 
 5
 2. CLAIMANTS (S.P.J. and Wellington), OPTIONEE (Mrs. Elson) and ELSONS do hereby covenant and agree that, on and after the effective date of this Agreement, none of them, severally or jointly, will seek to enforce against the trustee any cause of action alleged in said Counterclaim, Crossclaim and Third Party Claim or the motion to intervene (in the state court foreclosure action) or, for that matter, any other cause of action related to or involving, directly or indirectly, the financing heretofore extended by Trustee to claimants with respect to the property.
 
 
 6
 (4.1.)a. If Optionee shall fail to exercise such privilege of purchase on or before October 31, 1972 . . . Optionee shall thereafter have no further rights to purchase the property hereunder.
 
 
 7
 It was in the document denominated "Counterclaim, Crossclaim and Third Party Claim" in the foreclosure action that the Elsons and the two corporations first alleged that the Ratners, aided by Cameron-Brown's negligence or deliberate indifference, had schemed to squeeze the Elsons and the corporations out of the property's ownership by refusing to make mortgage and construction payments and then conspired with Cameron-Brown to foreclose on the property without first suing the Ratners as personal guarantors of the mortgage. By paragraph 2 of the June 8 agreement, then, the Elsons and the corporations bartered away their right to pursue these fraud claims or "any other cause of action relating to . . . the financing" in return for Mrs. Elson's option to purchase the property.
 
 
 8
 Zoning restrictions and the cancellation of a building permit issued by the City of Miami Beach to S.P.J. and Wellington having caused construction and financing problems, paragraph 8 of the June 8 agreement provided for Cameron-Brown's cooperation in litigation to be instituted by the Elsons and the corporations to seek reinstatement of the permit. Such a suit was filed in state court in September of 1972; while it was pending, October 31 came and went with Mrs. Elson failing to exercise her option. On December 29, 1972, partial summary judgment was entered requiring the city to reinstate the permit. The city's appeal from this judgment was dismissed by stipulation of the parties on March 28, 1973, with the city agreeing to leave the building permit in effect and to institute condemnation proceedings against the property. The jury was to assess damages in favor of the property owners limited to the fair market value of the land and certain other costs incurred by the owners in preparing the land for construction.
 
 
 9
 The city brought condemnation proceedings in state court, naming as a defendant the United States, which claimed an interest in the property. The United States in turn removed the action to federal district court.[5] By pre-trial stipulation the parties agreed that the "conflicting claims to the compensation to be made for the taking of the property" were to be determined by the court after the jury trial established the amount of compensation due. The jury awarded $5,216,000 in compensation, and this amount[6] was deposited in the registry of the court by the city; after a hearing, the district court found that Cameron-Brown was entitled to the proceeds and ordered their release. Quite understandably, in view of the large sum of money involved, this appeal was taken by S.P.J., Wellington and the Elsons. As grounds for their assertion that Cameron-Brown was not entitled to the proceeds of the award, appellants claim: that they were the beneficial owners of the property on the date of taking; that the Ratners, who allegedly hold legal title, have preempted a corporate opportunity; and that Cameron-Brown was judicially estopped from gainsaying ownership of the property in Wellington and S.P.J.
 
 
 10
 I. Beneficial Ownership in Parties Other than Cameron-Brown?
 
 
 11
 At various stages in this litigation appellants have claimed that Cameron-Brown's interest in the Brittany Bay property was a mortgage rather than outright ownership. In Florida, as is often the rule elsewhere, parol evidence is admissible to show that a deed or other instrument which appears absolute on its face was intended only as a mortgage. Grable v. Nunez, 64 So.2d 154, 160 (Fla.1953); Torreyson v. Dutton, 145 Fla. 169, 198 So. 796, 799 (1940). But we believe the district court was justified in refusing to open up the proceedings here to such extrinsic evidence. Beyond peradventure Cameron-Brown held only a mortgage when it first provided financing for the Brittany Bay property, but that mortgage ripened into fee ownership when, as unpaid creditors are wont to do, Cameron-Brown foreclosed, purchasing the Brittany Bay property at the public sale.[7] The only document by which Cameron-Brown purported to relinquish to any of the appellants any interest in the property after thus acquiring fee ownership was the June 8, 1972 agreement, which did no more than grant to Mrs. Elson an option to purchase. Even were we to imagine that this option could be construed as reinstituting the mortgage arrangement in some way, it is obvious that Mrs. Elson's "right of redemption" or whatever we would call it was lost on October 31, 1972, when the unexercised option lapsed. We can conceive of no extrinsic evidence which would convince the trial court or this court that the situation was anything other than it appeared to be: Cameron-Brown was, at least after the appeals from the foreclosure were dismissed, the sole owner of the Brittany Bay property; none of appellants had any rights in that property after Mrs. Elson's option expired on October 31, 1972. We believe the district court was correct in holding that from that day forward, including the date of taking under the condemnation order, Cameron-Brown's interest must be considered to have been ownership of the fee rather than a mortgage.
 
 
 12
 II. Corporate Opportunity?
 
 
 13
 As we noted earlier, paragraph 2 of the June 8, 1972 agreement precludes appellants from arguing here the "squeeze-out" theory first advanced in the "Counterclaim, Crossclaim and Third Party Claim" filed in Cameron-Brown's foreclosure suit. Appellants do, however, raise a claim of seizure of a corporate opportunity which must be considered. This claim arises from someone's close reading of Cameron-Brown's 1973 annual report, in which the Brittany Bay property was listed as one of several items of real estate acquired through foreclosure. The carrying value of the property was listed as of December 31, 1972, as $1,765,299, and as of December 31, 1973, as $1,145,298. In a note to this listing, it was stated that:
 
 
 14
 The reduction in carrying value at December 31, 1973 resulted from collections under a sales agreement with one of the original borrowers. That transaction was not recognized as a sale in the accompanying financial statements because the property was the subject of a condemnation suit under eminent domain and other uncertainties existed regarding the collection of the sales price . . . .
 
 
 15
 (emphasis added). Another note in a section of the report entitled "Subsequent Events" included the statement, "On March 1, 1974, the Trust collected the remainder of the sales price on the planned 780-unit condominium site . . . ." Building from here, appellants contend that since the "original borrowers" can only mean themselves and the Ratners, and since the appellants certainly have not purchased the property, the Ratners must have purchased it;[8] that since the Ratners were 50% shareholders of the two corporations, the purchase of land which the corporation had lost through foreclosure constitutes seizure of a corporate opportunity; that the Ratners should therefore be required to account to the corporations for the award; and that since the annual report shows that the Ratners, having purchased the property from Cameron-Brown, will be the ultimate recipients of the award, the court below should hear appellants' claim to the money before disbursing it.[9] Cameron-Brown contends, of course, that they were the owners on the date of taking and thus entitled to the award.
 
 
 16
 Several factors lead us to hold that the district court did not err in refusing to consider the "corporate opportunity" aspect of appellant's claim. Most telling is our feeling that as of any relevant date there was no corporate opportunity to purchase the property. In more than one instance below the appellants attempted to cast the option to repurchase set out in the June 8 agreement as one held by the corporations,[10] but the agreement clearly granted the option only to a single optionee, Susan Elson. Once the property was purchased at the foreclosure sale, the corporations had no right to repurchase, and after October 31, 1972, even Mrs. Elson had no further rights as shown by paragraph 4.1.a. quoted earlier. The continuing interest of appellants including the corporations in the property is evidenced by their zealous participation in this litigation, but it is evident that a lack of funds precluded their initial development of the property and must have similarly precluded Mrs. Elson's exercising her option or any further negotiations for repurchase by any of the appellants after the option expired. To the extent that the Elsons' agreements with the Ratners required the Ratners to provide financing and may have been breached by the Ratners, the Elsons (and, indeed, the corporations) might have an action against the Ratners in another forum, but paragraph 2 of the June 8 agreement prevents assertion here of such complaints against Cameron-Brown; the Ratners' alleged failure to provide financing and collusion with Cameron-Brown were particulars of the "Counterclaim, Crossclaim, and Third Party Claim," the enforcement of which was barred by paragraph 2. Litigation of such matters if not barred by limitations must take place outside this eminent domain action, and must involve the proper parties (i. e., the Ratners). Further, there is no allegation here that either of the Ratners was an officer or director of either corporation, and thus subject to the strict fiduciary duties out of which arises the duty to account for dealing in corporate opportunities. See, e. g., Etheredge v. Barrow, 102 So.2d 660, 662 (Fla.Dist.Ct.App.1956) (officers and directors "occupy a fiduciary or quasi-fiduciary relation to the corporation and its stockholders "); Independent Optical Co. v. Elmore, 289 So.2d 24, 25 (Fla.Dist.Ct.App.1974) (officers and directors, because of their "fiduciary character," may not acquire personally advantageous interests adverse to that of the corporation). Granting that the Ratners' 50% interests certainly would facilitate placing themselves on the board of directors had they so desired, we think the district court was not required to speculate as to whether appellants had merely omitted an element of their pleading or whether, instead, this requirement for bringing "corporate opportunity" law into play was lacking in the case. Finally, we note strong indications that Florida courts would not find a violation here even if the Ratners did occupy the requisite fiduciary positions. In News-Journal Corp. v. Gore, 147 Fla. 217, 2 So.2d 741 (1941), the Florida Supreme Court found a breach of an officer's fiduciary duty in purchasing at a foreclosure sale a tract under lease to his corporation and increasing the rent without attempting to obtain a loan for the corporation in order to purchase it for the corporation, where the evidence indicated that such a loan could have been secured; and the court in Etheredge v. Barrow, 102 So.2d 660, 662 (Fla.Dist.Ct.App.1958), cited a general rule prohibiting an officer or director from purchasing corporate property at a foreclosure sale. But in Procacci v. Solomon, 317 So.2d 467 (Fla.Dist.Ct.App.1975), the court upheld a trial court's finding that an officer/director did not act improperly in purchasing formerly corporate property from a bank which had obtained the property by foreclosing and purchasing at the judicial sale. This case, pared down to facts relevant here, closely parallels Procacci ; when purchased by the Ratners, if purchased by them at all, the property was no longer corporate property but was owned entirely by the foreclosing entity, Cameron-Brown. The corporate opportunity had been lost in the foreclosure sale.
 
 
 17
 Appellants' dispute on this point is with the Ratners, who are not before us. The trial court was correct in leaving for another day and forum their corporate opportunity claim.
 
 
 18
 III. Judicial Estoppel?
 
 
 19
 By Paragraph 8 of the June 8, 1972, agreement, Cameron-Brown agreed to cooperate in any future suits or administrative proceedings (to be conducted at the expense of Mrs. Elson as optionee, or appellants generally as "claimants") relating to zoning of the Brittany Bay property or reinstatement of building permits. Pursuant to this agreement, as noted earlier, such a suit was filed on September 5, 1972, approximately two months before the expiration of the option period; the complaint filed in that action alleged that S.P.J. and Wellington were the "owners and beneficial owners" of the Brittany Bay property, and that Cameron-Brown claimed "an interest in the property." The suit ended in partial summary judgment against the City, followed by the City's agreement to dismiss its appeal and institute condemnation proceedings. Appellants now contend that Cameron-Brown, having joined in this representation as to the title to the property, is estopped from denying appellants' rights to the compensation award.
 
 
 20
 We note first that the state court proceeding instituted by the offending complaint was, under the June 8 agreement, appellants' suit, and that Cameron-Brown simply agreed to cooperate. We would be reluctant in any event to find that a party could be subject to judicial estoppel for such loose participation in the pleading in question. Further, there is merit in the district court's finding that Cameron-Brown's alleged "interest in the property" was consistent with Cameron-Brown's position at that time: holding the property in fee, subject to an outstanding option to purchase it at a price which, from all indications,[11] was well below the appreciated value of the tract.
 
 
 21
 More to the point, however, is the lack of any apparent prejudice resulting from this representation of the state of title a Florida requirement for the operation of judicial estoppel:[12]
 
 
 22
 (A) party, who in an earlier suit on the same cause of action, or in an earlier proceeding setting up his status or relationship to the subject-matter of his suit, successfully assumes a factual position on the record to the prejudice of his adversary, . . . cannot, in a later suit on the same cause of action, change his position to his adversary's injury . . ..
 
 
 23
 Palm Beach Co. v. Palm Beach Estates, 110 Fla. 77, 148 So. 544, 549 (1933) (emphasis added).
 
 
 24
 (T)he party claiming the estoppel must have been misled and have changed his position; and an estoppel is not raised by conduct of one party to a suit, unless by reason thereof the other party has been so placed as to make it unjust to him to allow the first party to change his position.
 
 
 25
 Chase & Co. v. Little, 116 Fla. 667, 156 So. 609, 610-611 (1934). "(O)nly those whom the representation is made to or intended to influence and their privies may take advantage of the estoppel." Booth v. Lenox, 45 Fla. 191, 34 So. 566, 569 (1903). The true adversary in the prior proceeding was the City; even were we to conclude that the City had been prejudiced by the representation of title in the September 5, 1972, complaint which we do not it is clear that the City is not injured by the "change in position" here, if one has indeed taken place. Appellants here were not persons whom the pleading was intended to influence, nor were they prejudiced by it. The principles of judicial estoppel constitute important protections for litigants in appropriate cases. This is not such a case.
 
 
 26
 The judgment of the District Court is AFFIRMED.
 
 
 
 [1]
 Planned construction included a 780-unit condominium complex with parking and recreational facilities
 
 
 [2]
 Intervenors alleged that default was the result of the Ratners' failure to make payments as contemplated in the agreements. We need not consider this allegation since new financing was obtained from Cameron-Brown, rendering the original mortgage superfluous to this litigation
 
 
 [3]
 Again, according to the intervenors, because of the Ratners' failure to carry out their obligation reaffirmed at the time the Cameron-Brown mortgage was negotiated to provide interim financing and make payments on the mortgage. We assume without deciding that such an obligation did exist, and will discuss infra its effect, if any
 
 
 [4]
 The significance of Mrs. Elson's, rather than the corporations', being the optionee will become apparent
 
 
 [5]
 The United States was properly a defendant under 28 U.S.C. § 2410 (1970); removal was therefore proper under 28 U.S.C. § 1444 (1970). We note some controversy concerning whether § 1444 independently confers federal removal jurisdiction in cases in which the federal district court would not have original jurisdiction of the cause. See, e. g., George v. United States, 181 F.Supp. 522, 524 (S.D.Tex.1960); 1 A Moore's Federal Practice P 0.166 at 360-64 (2d ed. 1974). We find ourselves in agreement with Professor Moore, id. at 361, that § 1444 confers a substantive right to remove, independent of any other jurisdictional limitations. This outcome has apparently been assumed, although not faced headon, in prior decisions of this circuit involving removal under § 1444. See General Electric Credit Corp. v. Grubbs, 447 F.2d 286 (5th Cir. 1971), rev'd on other grounds, 405 U.S. 699, 92 S.Ct. 1344, 31 L.Ed.2d 612 (1972); Connecticut Mutual Life Ins. Co. v. Carter, 446 F.2d 136, 138 n. 3 (5th Cir.), cert. denied, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971)
 
 
 [6]
 Less $500,000 which was deposited with the court when the action was instituted. By the terms of the March 28, 1973 stipulation, title was deemed vested in the city upon this initial deposit, and the rights to compensation deemed vested in the parties entitled thereto
 
 
 [7]
 Certainly none would argue that a sheriff's deed could be shown to be a mortgage
 
 
 [8]
 Appellants' first rather inartful claim, raised in response to Cameron-Brown's motion to withdraw funds, was that since Wellington and S.P.J. were the original borrowers, the statements in the 1973 annual report indicated prima facie that Wellington and S.P.J. were entitled to the funds. This contention has not been raised on appeal, having apparently been superseded by the "corporate opportunity" claim
 
 
 [9]
 Appellants moved for discovery after the size of the award was determined, in order to plumb more thoroughly the relationship between Cameron-Brown and the Ratners with respect to the Brittany Bay property. The district court's order permitting withdrawal of the funds obviously constituted a denial of the discovery motion
 
 
 [10]
 For example, in one response filed August 23, 1974, appellants referred to the "settlement agreement by virtue of which the named corporate entities . . . were granted a $2,000,000 option of purchase," and then claimed that "in effect the Ratners exercised the corporation's options contained in the agreement of June 8, 1972."
 
 
 [11]
 Including the size of the subsequent condemnation award
 
 
 [12]
 As we have noted recently in a diversity jurisdiction context, the relevant state formulation of the judicial estoppel principle should be applied when nonfederal issues are at stake. In re Southwestern Bell Telephone Co., 535 F.2d 859, 861 n. 4 (5th Cir.), aff'd en banc, 542 F.2d 297 (1976). The issues here are distinctly nonfederal, with federal jurisdiction being founded rather accidentally on the presence of the United States as a wholly quiescent defendant