**UNITED COMPANIES FINANCIAL CORPORATION, Plaintiff,**

v.

**Clarence W. BRANTLEY and Elizabeth W. Brantley, Defendants.**

**Civ. No. 80–9036.**

United States Bankruptcy Court, N. D. Florida, Pensacola Division.

Sept. 18, 1980.

William E. Bond, Jr., Pensacola, Fla., for plaintiff.

J. Paul Fitzgerald, Milton, Fla., for defendant.

## OPINION

N. SANDERS SAULS, Bankruptcy Judge.

An order was entered herein on July 29, 1980, continuing the stay in effect for a period of sixty (60) days. As indicated therein, this opinion is entered to aid the parties on rehearing as to the findings and conclusions with respect thereto, and, with respect to certain issues relating to further proceedings herein together with the application thereto of the new provisions of the law.

Clarence W. Brantley and his wife, Elizabeth, filed a joint petition under Chapter 13 of Title 11 of the United States Code on April 16, 1980. Six days later, on April 22, 1980, the plaintiff, United Companies Financial Corporation (sometimes hereinafter "United"), filed its complaint for modification of the stay.

The plaintiff is the holder of a final judgment of foreclosure under which the subject real property of the defendants was scheduled for a foreclosure sale on April 17, 1980. This sale was stayed by the filing of the instant Chapter 13 petition. The property consists of 1.5 acres upon which the defendant debtors' residence is located; a contiguous and adjoining 45.26 acres upon which various farm outbuildings are located, and, some 160 wooden open–bottom structures designed and utilized for the commercial production of earthworms.

United asserts that it is due the judgment sum of $90,930.12, plus interest thereon at the legal rate from March 18, 1980. This sum is comprised of principal due in the sum of $79,750.67; $8,040.45 as interest through March 18, 1980; $67.00 as title search expense; $3,000.00 for attorney's fees; and, $72.00 as taxable court costs. On June 25, 1980, an amended claim was filed reflecting an amount due, as of that date, of $91,095.87. Attached to said amended claim is a copy of the mortgage which was foreclosed and an assignment of a life insurance policy held as security.

Pursuant to Section 362(e) of Title 11, a preliminary evidentiary hearing was scheduled for and held on May 16, 1980. On May 12, 1980, the defendants filed their answer to the complaint. The defendants denied the plaintiff's allegations that there was no equity in the property and that the property was not necessary or essential to an effective reorganization. Among other responses, defendants also alleged that it would be grossly unjust to modify the stay because (1) the property encumbered included the debtors' residence; (2) the adjacent acreage contained a developed earthworm farm; (3) a reasonable period of time was necessary to cure the default by sale of a portion of the property and the development of a market for the earthworm production; and, (4) modification would be inequitable in light of all the attendant circumstances. These last referred to circumstances were alleged as follows:

"The defendants admit that they need to delay the sale of the real property so that they can pay all of their indebtedness, and aver that this is just and equitable in light of the fact that plaintiff, within a period of fourteen (14) months, made four (4) loans to the defendants, which eventually totalled a face amount of $80,000. That during this period of time, the defendants paid to the plaintiff brokerage fees which are over and above any interest paid, in the amount of $15,385.70, and in addition thereto were required to purchase life insurance in a gross amount of $23,640.70. After a reduction of all of the costs paid to the plaintiff pursuant to said loans, the defendants received for their benefit the sum of $53,385.15, yet there is now an encumbrance against their home, farm and source of livelihood in the gross amount of $90,930.12 . . . . "

At the preliminary hearing evidence was received as to the value and necessity of the property. The plaintiff submitted appraisal evidence that the value of the property was $99,700. Before adjustment, the residence was valued at $22,160; the farm outbuildings at $5,000; and the land, field fencing and certain mobile home hookups at $74,816. No value was attributed to the earthworm operation since the appraiser felt the production beds could be moved. The defendant husband testified that the value of the real property was $100,000; that the earthworm operation had a value of $50–60,000; and, that the production beds could not be moved without substantial loss. He testified extensively concerning the business and the market with respect to earthworm farming. He also testified as to his various transactions with the plaintiff.

As shown by the evidence, the defendants initially sought a loan in part to consolidate existing debts to various lenders and also to enter into the earthworm production business. In April of 1977, the defendants executed an unsecured note for $16,750. Of this amount, $5,427.34 went to pay off various lenders; $69.70 to miscellaneous costs; $6,659.35 to the debtors; $183.16 to prepaid interest and hazard insurance; $2,660.00 to an alleged life insurance affiliate or subsidiary of the lender for the prepayment of premiums for diminishing term life insurance on the life of the husband debtor; and, $1,749.45 as a fee to the originating broker, an alleged affiliate or subsidiary of the lender.

Six (6) months later, in October of 1977, the defendants executed a new note for $52,400. Apparently at this time a mortgage was also executed. Of this amount, $14,243.59 went to pay off the prior April loan; $5,163.00 to United Worm Growers; $6,674.21 to Pensacola Title Company and

the defendants; $13,454.30 to the defendants; $231.90 to prepaid interest and miscellaneous costs; $7,644.00 to the alleged insurance affiliate or subsidiary for diminishing term life insurance; and, $4,989.00 to the alleged broker affiliate or subsidiary.

Four (4) months later, in February of 1978, a further note in the sum of $10,500.00 was executed by the defendants. Of this amount, $7,500.00 went to the defendants; $157.75 to miscellaneous costs; $1,668.00 to diminishing term insurance; and, $1,174.25 to brokerage.

Four (4) months later, in June 1978, the defendants executed a new consolidated note secured by mortgage in the sum of $80,000. Of this amount, the sums of $43,306.87 and $9,032.59 went to pay off the respective balances of the prior $52,400.00 and $10,500.00 notes; $681.00 to title insurance; $399.00 to miscellaneous costs; $7,507.54 to the defendants; $11,600.00 to diminishing term life insurance on a policy with a face amount of only $40,000; and $7,473.00 to the broker. This last note was payable in equal monthly installments of $1,057.24 until paid in full. This would thus mathematically be for a period of 75.67 months or 6.3 years.

The defendants paid the monthly payments until November 1, 1978, when the company (United Worm Growers) to which they sold their production failed. During this time the debtors averaged approximately $3,500.00 per month from their business. In February of 1979, the defendants paid $3,175.00 to United. The defendant husband testified that this was for a one–year moratorium. The plaintiff's witness testified that this was an extension payment for 150 days and brought the account current to April 15, 1979. Thereafter, no further payments were made and the plaintiff's foreclosure judgment was entered on March 18, 1980. During said period of default, the defendants sought to refinance and extend the loan with United over a longer period of time but were refused. As of May 15, 1980, the sum necessary to cure the default and reinstate was $15,506.36.

At the conclusion of the preliminary hearing, the stay was ordered to remain in effect and the cause was set over for final hearing. To coincide with the court's scheduled hearings in the Pensacola division of this district, the parties stipulated to a final hearing date on June 25, 1980, in Pensacola for the convenience of the parties and witnesses.

Upon final hearing, additional testimony and documentary evidence was heard and received. In addition, the defendants, at the outset, filed an objection to the allowance of the plaintiff's claim alleging essentially the same matters asserted in their answer. It was further alleged:

"That the Plaintiff and its subsidiary corporations are so closely connected as to make the loan usurious or in the alternative that the initiation and origination of four (4) loans within fourteen (14) months is churning and unlawful as to the debtors. And any event, to allow the brokerage fees collected and the life insurance fees collected as a claim against the debtor is unreasonable, unjust inequitable."

In view of the ostensible intent of § 362 that stay relief proceedings are not appropriate for the complete hearing and determination of any issues largely collateral or unrelated to lack of adequate protection, equity, necessity or other cause for relief from the stay, the court sustained the plaintiff's objection to the defendant's motion to consolidate and present extensive additional evidence either affirmatively or by way of counterclaim in support of the usury and churning objections to the plaintiff's claim. See, *H.Rep.* 95–595, p. 344; *S.Rep.* 95–989, pp. 53, 55, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5839, 5841, 6300. The defendants were, however, permitted to raise and the court took notice of their limited evidence with respect to the existence of such usury and churning claims. As directed in the record, this did not mean that the existence of affirmative defenses and possible counterclaims could not be raised and considered by the court in exercising its discretion as to any vacation or modification of the stay; but, that what

was precluded, was any res judicata determination of such collateral claims on the merits at or as a result of the hearing. See, *S.Rep.* 95–989, p. 55, U.S.Code Cong. & Admin.News 1978, p. 5841.

The plaintiff then presented its evidence by its appraiser that the value of the property was $99,700.00 without any value being attributable to the earthworm production beds. It presented evidence by two other witnesses that any anticipated reasonable sale costs for the property would range from $1,856.00 to $2,856.00 for such items as title insurance, stamps, survey, attorneys fees and taxes, and, if a realtor was utilized, a real estate commission ranging from $7,500.00 to $10,000. The plaintiff also produced additional testimony that the earthworm production beds were movable; although, on cross examination, the witness (McClure) stated that he would hate to lose his production beds and that he, too, had lost substantial money in the business.

The defendants presented evidence by their appraiser that the value of the property including the production beds was $156,365. A value of some $63,000 was placed on the production beds by the appraiser utilizing both a completed value and income approach. Another witness (Mrs. O'Day), testified that she had been in the business for the last two years simply maintaining her production beds as there had been no ready market outlet after the demise of the United Worm Growers Company. As a member of a cooperative association of growers, she was, however, optimistic that a lucrative market would soon be available with the imminent completion of a dehydration plant in Florida by new buying company. Mrs. O'Day further testified that any moving of the production beds would cause substantial loss and would set back any profitable production by at least two years.

Taking the matter under submission, the court entered its order on July 29, 1980, continuing the stay for a period of sixty (60) days. It was further provided that the court would on a continuing basis reconsider at that time the issues of valuation and adequate protection to determine whether the stay should then be vacated or modified, unless, in the interim, the defendants provided a plan for the curing of the default upon the mortgage within a reasonable period and provided for current payments while the case is pending.

Without any value being attached to the production beds, the plaintiff argues that the property has a value of $99,700.00; that, even if the property was marketed and sold outside of foreclosure to achieve its fair market value, its debt together with the anticipated costs of any such sale would equal or exceed such value; that the defendants, therefore, have no equity in the property; and, that it will suffer irreparable harm for which no adequate protection can be provided.

If the matter be considered with a view that a foreclosure sale would most likely produce a recovery less than the fair market value, it is apparent that the plaintiff would have to either choose to take a loss on a sale to another bidder at any foreclosure sale or bid it in at the amount of its debt and then hold and market it, if it so desired, without any forced sale considerations. At the value asserted by the plaintiff, any equity of the defendants is so precarious and fragile that no protection absent an immediate substantial reduction of the debt would be adequate.

But, there is substantial competent evidence that there is added value in the form of the production beds which are being maintained in a ready harvest condition. This value, of course, is dependent upon the completion of a dehydrating plant to provide a market for the sale of the production. At the time of hearing, the testimony was such that this market was expected in the immediate future. In view of this circumstance, and the residual salvage value of the production beds, the court found sufficient equity to adequately protect the plaintiff during a sixty (60) day continuation of the stay.

■ In addition, the pending objection of the defendants as to the plaintiff's claim may have a direct and substantial bearing upon the allowable amount of such claim

and thus the interest of the plaintiff that requires adequate protection. Obviously, the amount of allowable debt must initially be determined if any question with respect thereto is raised. If, by reason of an alleged violation of the statute of frauds, usury, unconscionability, lack of consideration, or other similar circumstance, the debt is unenforceable against the debtor, either in whole or in part, then, to such extent, the claim is not allowable under § 502(b)(1). To the extent it is not allowable, it will not be a secured claim as determined under § 506 and thus will not require adequate protection for the value thereof under § 362.

Every litigant seeking relief to foreclose and thus be released from the injunction of the automatic stay, must, at a minimum, establish the validity and perfection of its security interest; the amount of the debt and other allowable costs secured by its secured claim; and, must carry the ultimate burden of proof with respect to equity. Obviously, leave to foreclose should not be granted to any mortgagee who has not perfected its mortgage. Any unperfected security interest is invalid against a trustee or debtor in possession and it would be an abuse of discretion to permit foreclosure proceedings to be instituted or continued when the perfection and validity of the security interest sought to be foreclosed cannot be established.

Not so obvious, apparently, is the fact that the amount of the allowable debt sought to be charged as being secured must also be established. Any mortgage or security interest is but the shadow of a debt. It expands or contracts in accordance with the size of the debt. If the debt ceases to exist the mortgage disappears. If the debt is reduced its shadow contracts. If the debt should increase its shadow expands.

In any stay litigation context, the considerations involved in the so-called "EEPP" principles are ever present to bear upon the exercise of the court's discretion. That is to say, the considerations of (1) essentiality, (2) equity, (3) probability of harm to the interest of its secured creditor [for which adequate protection to alleviate or diminish such should be designed or devised] and, (4) probability or reasonable likelihood of a successful plan of reorganization are always in a state of flux to be each considered, but each alone not being absolutely determinative in and of itself.

The consideration of essentiality may sometimes be capable of determination in and of itself. In some instances it is clear that a property either is or is not absolutely essential to any continuation of a business enterprise or the formulation of a successful plan. But, the considerations of probable harm to a secured creditor [for which adequate protection should be devised or designed] and the probability of there being a reasonable likelihood of a successful plan of reorganization usually feed upon whether or not any equity exists in the property being considered. The matter of equity bears a distinct and direct correlation to the other considerations. It is the loom upon which the other considerations weave. To the extent that any factor or claim directly bears upon the matter of equity, a distinct and direct effect is thus made upon the matters of probable harm to the creditors' interest [hence the necessity for adequate protection] and the probable outlook that a business can be continued and a successful plan developed.

Consideration of the matter of equity thus brings us back to a determination of the allowable amount of the creditors' alleged secured claim, if it is questioned, versus that value established as being the value of the property under consideration. The difference is the debtors' equity. Like the mortgage shadow, the debtors' equity also will expand or contract depending upon the size of the mortgage debt. Any matter, claim, or circumstance, then, that directly bears upon the amount of the claim will, accordingly, bear directly upon the extent of the debtors' equity and, in turn, will bear directly upon the extent of any probable harm to the secured creditor for which adequate protection should be considered and also the reasonable likelihood that a successful plan may be proposed.

If, by reason of any claim, matter or circumstance, the creditors allowable secured claim should be reduced then the debtors' equity will correspondingly expand. If the equity of the debtor is greater than that initially presumed then probable harm to the creditor is of a lesser magnitude [hence the necessity for adequate protection diminishes] and the reasonable likelihood of a successful plan assumes greater magnitude.

■ The key determination as to whether or not any matter, claim or circumstance should bear upon the amount of the creditor's claim [and hence trigger resulting effects upon the debtors' equity, probable harm to and adequate protection for a creditor, as well as, probable successful plan formulation] is whether such matter, claim or circumstance directly or only indirectly relates to the amount of such creditor's claim. If it directly relates it should enter into the determination of the court in the exercise of its discretion whether or not the injunction should be maintained or vacated or modified. If it is only indirectly related, it should not enter into the consideration of whether to vacate or maintain the injunction.

Although defenses or counterclaims may be related or, to an extent, be plausibly relevant to any determination of the amount of debt due if they are based upon allegations such as misapplication or wrongful receipt of funds, breach of contract or various miscellaneous alleged contractual duties, or fraud or false representations, they are related or relevant only in the sense that, if successfully maintained, they would ultimately effectuate a reduction or set–off in the overall debt–credit relationship between the parties. These type of matters and claims really do not go to the validity and amount of the specific debt or lien itself.

Contrasted to such defenses or counterclaims, however, are those based upon such matters as alleged violations of the statute of frauds which would bar any recovery whatsoever on the specific debt itself; non–perfection of a security interest which would bar any lien enforcement whatsoever on the debt itself; or usury which would bar any recovery either to some extent or totally on the debt itself depending upon the circumstances. Other such counterclaims or defenses might be based upon a lack of consideration altogether, as distinguished from a failure of consideration, or some circumstances of unconscionability which would bar recovery upon the specific debt itself. These latter defenses or counterclaims strike at the very heart of the specific debt amount itself which the creditor seeks to enforce by way of his lien or the validity of the lien itself. The former type of defenses or counterclaims do not so strike. They relate generally to the overall debt–credit relationship between the parties.

Under the old law, it was indicated [due mainly to the confused jurisdictional status of the court's power to entertain counterclaims or affirmative defenses] that all counterclaims or affirmative defenses were not appropriate for consideration in stay relief litigation. It appears that the reach of cases such as *In re Groundhog Mountain Corp.*, 1 B.C.D. 923 (S.D.N.Y.1975), *In re The Overmyer Co.*, 2 B.C.D. 992 (S.D.N.Y. 1976), *In the Matter of Essex Properties, Ltd.*, 3 B.C.D. 331 (N.D.Calif.1977), was considered too broadly. The determinations in each of these cases were largely the result of their particular factual circumstances wherein there were strong indications of either unwarranted delay on the part of the counterclaimant [*Groundhog Mountain*] or the counterclaims and affirmative defenses asserted were not directly related to the specific debt in question [*Overmyer*]. In the *Groundhog Mountain* case, it was pointed out that during the some nine (9) months that the case had been pending the debtors could have availed themselves of the opportunity to file for a determination of the extent and validity of the creditor's lien over which the court would have had jurisdiction but had failed to do so. As pointed out in 13 *Collier* ¶ 701.05, p. 7–19 (14th ed.), any consideration of the extent to which a creditor is secured requires a comparison

between the value of the collateral and the amount of the outstanding indebtedness.

In the *Essex Properties, Ltd.* case, the court apparently let the hide go with the hair. There, affirmative defenses as well as counterclaims were asserted on the basis of negligence, breach of contract, fraud and usury. Clearly the court was correct with respect to those assertions which were based upon negligence, breach of contract and fraud as they did not directly relate to the specific debt in question but rather to the overall debt–credit relationship of the parties. It also, however, dismissed the assertion based upon usury. It is noted, however, that the court did take notice and refer to the case of *In re Sal Amato, Inc.*, 1 B.C.D. 954 (D.Conn.1975), wherein it was indicated that a question of usury was considered by the court in a stay relief litigation context. The *Essex* court distinguished the *Sal Amato* case on the basis that there the allegation of usury concerned the extent of the debtor's equity and not defenses and counterclaims amounting to set–offs and claims for money judgment.

On the subject of usury generally in Chapter XIII cases under the former Act, the subject of usury as related to creditors' claims was specially dealt with in § 656(b) which provided that before confirming any plan "the court shall require proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt was contracted." Rule 13–301(b) is the rule version of this statutory prescription. It provides with slight revision that:

"(a) ... A proof of claim shall consist of a statement in writing setting forth a creditor's claim and setting forth facts showing that such claim is free from any charge forbidden by applicable law....

(b) ... A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim, but any creditor may be required by the court to establish, by affidavit or in such other manner as the court may require before allowance of the claim, that it is free

from any charge forbidden by applicable law."

As a result, if a creditor filed a claim, upon any objection, or as otherwise required by the court, the creditor apparently had the burden of establishing that its claim was free from any charge forbidden by applicable law. *In re Perry*, 272 F.Supp. 73 (D.C.Me.1967); see also, *McCollum v. Hamilton Nat'l Bank*, 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938). This, of course, is contrary to the usual state procedure providing for the burden to be upon the one seeking to establish usury. See, *River Hills, Inc. v. Edwards*, 190 So.2d 415 (2 D.C.A. Fla.1966). Then, as now, however, there was no absolute requirement that any claim of any type be filed.

Section 502 of the new Title 11 now treats the allowability of all claims. It is provided in § 502(b) that upon any objection a claim shall be allowed "except to the extent that–(1) such claim is unenforceable against the debtor, and unenforceable against property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; ...". The legislative history [*H.Rep.* 95–595, p. 352, U.S.Code Cong. & Admin.News 1978, p. 6308] with respect to this new section notes:

... The burden of proof on the issue of allowance is left to the Rules of Bankruptcy Procedure. Under the current Chapter XIII Rules, a creditor is required to prove that his claim is free from usury, Rule 13–301. It is expected that the Rules will make similar provision for both liquidation and individual repayment plan cases. See, Bankruptcy Act § 656(b); *H.Rep.* 31, 94th Cong., 1st Sess., § 6–104(a) (1975). Paragraph (1) requires disallowance if the claim is unenforceable against the debtor for any reason (such as usury, unconscionability, or failure of consideration) other than because it is contingent or unmatured ...."

As indicated by the advisory committee note to Rule 13–301 in the 1979 *Collier Rules Edition*, this rule has not been affected by the new code.

With the advent of the new law, there is now no question whatsoever with respect to the court's jurisdiction to determine any matter by way of affirmative defense or counterclaim that arises in or is related to any case pending under the new title. In fact, with respect to any matter relating to any mortgage foreclosure which involves a debtor or his estate, upon the motion of either party, the mortgage foreclosure action itself may in appropriate cases be removed in its entirety for foreclosure or other appropriate disposition. 28 U.S.C. §§ 1471, 1478 [eff. Oct. 1, 1979, Sec. 404(a) and Sec. 405(b), Pub.L. No. 95–598, 92 Stat. 2685 (1978)]; see also, *City of Miami Beach v. Smith*, 551 F.2d 1370, fn. 5, (5th Cir. 1977). Hence, jurisdictional consideration should no longer be of any moment in determining whether affirmative defenses or counterclaims will lie in any chapter stay litigation cases. But, any such determination must still be viewed in the context of whether or not it is appropriate to determine such defenses or counterclaims in an injunction context.

■ As indicated in most of the cases decided under the old law, affirmative defenses or counterclaims based or grounded upon matters not directly related to the specific debt should not be the subject of consideration in determining whether relief from the injunctive effect of the stay should be granted. However, as indicated in such cases as *In re Sal Amato, Inc.*, 1 B.C.D. 954 (D.Conn.1975), and *Northwestern Mutual Insurance Company v. Sixth Avenue Investment and Development Company*, 2 B.C.D. 1222 (S.D.Calif.1976), defenses and counterclaims related directly to the specific debt in question should be the subject of appropriate consideration in stay relief determinations.

To be sure, the desired expedition of stay litigation under the new law may not always be conducive to any final determination of questions going to the merits which are so serious, substantial, difficult and doubtful as to make them fair ground for litigation and thus for more deliberative investigation. 1 *Moore's Manual*, § 10.07[2]

(1979); 7 *Moore's Federal Practice*, ¶ 65.04. This, however, should not cause any undue consternation when such questions are raised for the matter should proceed as any other injunction proceeding under the established precepts relating to injunctive relief in federal courts in accordance with Rule 65 of the *Federal Rules of Civil Procedure*. In fact, the system is designed to follow the established federal pattern under Rule 65. As stated in the legislative history to the new law [*H.Rep.* 95–595, p. 344; *S.Rep.* 95–989, p. 55, U.S.Code Cong. & Admin.News 1978, pp. 5841, 6300]:

"The filing of the petition which gives rise to the automatic stay is similar to a temporary restraining order. The preliminary hearing is similar to the hearing on a preliminary injunction, and the final hearing and order is similar to a permanent injunction. The main difference lies in which party must bring the issue before the court. While in the injunction setting, the party seeking the injunction must prosecute the action, in proceedings for relief from the automatic stay, the enjoined party must move. The difference does not, however, shift the burden of proof. Subsection (g) leaves that burden on the party opposing relief from the stay (that is, on the party seeking continuance of the injunction) on the issue of adequate protection.

At the expedited hearing under subsection (e), and at all hearings on relief from the stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustees to recover property of the estate or to object to the allowance of a claim. [*H.Rep.* 95–595, p. 344.].

\* \* \* \* \* \*

... However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is a determination of such collateral claims on the merits at the hearing. [*S.Rep.* 95–989, p. 55.]"

Essentially the same considerations are present in considering whether an injunction should be initially granted or considering whether an injunction already in place should be vacated or modified. Under Rule 65, after any temporary restraining order has been entered, the party obtaining such must immediately bring on for hearing his motion for a preliminary or temporary injunction. The Rule is designed to weed out those cases where decision may be made with little or no evidence from those wherein substantial evidence may be necessary. It is also provided that, where necessary to expedite the disposition of the case and avoid duplication of effort, the hearing on the motion for injunction may be consolidated with the trial on the merits. See, 1 *Moore's Manual,* § 10.07[2], pp. 628 636.

Some matters are capable of assertion as either an affirmative defense or as a counterclaim. An affirmative defense seeks no other relief other than the bar of the remedy sought by the plaintiff. A counterclaim seeks additional relief in addition to the barring of the remedy sought by a plaintiff. When it is remembered that either could be asserted in a state court action, it should also be remembered that the entire matter may now be removed. If delay would be encountered by the assertion of such in a state proceeding, as is frequently the case, it should not be surprising that such assertions may also cause some delay in the federal forum.

Briefly alluding to Florida law with respect to mortgage foreclosures and affirmative defenses or counterclaims based upon usury, it appears that in a mortgage foreclosure a defendant–counterclaimant alleging usury is, upon demand, entitled to a jury trial upon that issue prior to proceeding with the foreclosure. See, *Smith v.*

*Barnett Bank of Murray Hill,* 350 So.2d 358 (1 D.C.A.Fla. 1977); *Adams v. Citizens Bank of Brevard,* 248 So.2d 682 (4 D.C.A. Fla. 1971). Also, when usury is established the court may exercise its discretion in refusing to lend equity power to enforce the mortgage. *Indianapolis Morris Plan Corp. v. Portela,* 364 So.2d 840 (3 D.C.A. Fla. 1978); *Wasman v. Rubinson,* 341 So.2d 802 (3 D.C.A. 1977); *Vance v. Florida Reduction Corp.,* 263 So.2d 585 (1 D.C.A. 1972). See generally, 2 *Boyer, Florida Real Estate Transactions,* § 32.20[2], [7].

In sum, then, when affirmative defenses or counterclaims are asserted and raised which strike at the heart of the amount of the creditor's claim or the validity of his lien, such defenses or counterclaims directly affect the issue of equity and thus the issues of harm and adequate protection, as well as the reasonable probability of any plan of reorganization. When such are asserted or raised, the court should give consideration to them in determining whether or not the stay should remain in effect. In the event a determination is made that the stay should continue, due consideration should be given to a consolidation of all of the issues for prompt hearing in order that an early and final determination can be made as to the merits of the defenses or counterclaims and with respect to the propriety of any vacation, modification or maintenance of the stay.

It now appears under the new law that a defendant has several options available in stay relief litigation when there are substantial questions directly related to the amount of a creditor's debt or the validity of his lien. The defendant may either object to the creditor's claim, if he has filed a claim; file a complaint for a determination of the extent and validity of such creditor's debt and lien; file any counterclaim or affirmative defense directly related to the specific debt or lien; or, if a state foreclosure is pending, remove the entire proceeding to this forum. Irregardless of which procedural option is selected, the defendant must seek a prompt hearing or be prepared at the first available opportunity to demon-

strate that his assertion has a direct relationship to the specific debt or lien; that there is serious or substantial merit to his assertion such that its existence should be considered [as, by analogy, any such substantial assertion would be subject to consideration at a preliminary injunction hearing under Rule 65 of the Federal Rules]; and, that consideration should be given to any consolidation and advancement as may be available under Rule 65(a)(2).

In the instant case, the defendant should immediately seek an early hearing for a determination of the merits of their objections to the plaintiff's claim, failing which any such lack of diligence should also be considered upon the expiration of the sixty (60) day continuance granted at the hearing upon reconsideration of the vacation or modification of the stay herein. In this case, the seeking of an early determination of the assertion raised by the defendants is clearly the burden of the defendants.

Several other remaining questions raised by the parties at the hearing need to be briefly dealt with.

First, whether or not the defendants can seek to cure any past default upon a mortgage which has been the subject of state court foreclosure proceedings to the extent that a final foreclosure judgment has been entered but sale thereunder stayed. In other words does the mortgage, in view of the judgment, still remain in existence so as to be capable of being cured under § 1322(b)(5). Clearly if the mortgage has ceased to exist and has merged into the judgment then it cannot be cured of default. There no longer would be any mortgage to cure. But, if it has not, then, as provided in § 1322(b)(5) a plan may provide for the curing of any default within a reasonable time and for the maintenance of payments while the case is pending.

■■■ In Florida, any foreclosure is by action and sale. The foreclosure judgment is for a sum certain which is determined to be due wherein it is provided that should the determined sum not be paid within a fixed number of days then, in that event, the property will be sold to satisfy the mortgage. A foreclosure judgment cannot operate to confirm title in the mortgagee. Until the property is actually sold, the mortgage remains in existence subject to satisfaction. 2 *Boyer, Florida Real Estate Transactions* § 32.20[1]. When the mortgagee forecloses and purchases the property at the public foreclosure sale, then the mortgagee's interest merges and the mortgage is extinguished. 2 *Boyer, Florida Real Estate Transactions, supra; City of Miami Beach v. Smith,* 551 F.2d 1370, 1374 (5th Cir. 1977). Of course, when someone other than the mortgagee purchases at the sale then the mortgage is satisfied from the sale proceeds. In this case the mortgage remains in existence since a foreclosure sale was stayed. It is thus capable of being cured upon reasonable terms.

■■■ We next turn to the second question left pending. That is, under § 1322(b)(2), can the mortgage default not only be cured but are the creditor's rights and the mortgage itself susceptible to modification by any plan with respect to the mortgage's terms or the manner of payment. Section 1322(b)(2) now permits such modifications in Chapter 13 cases with respect to secured claims other than those secured only by a security interest in real property that is the debtor's principal residence. Although the legislative history is silent, the plain intent of the exception is to provide stability in the residential long–term home financing industry and market. It is to specifically protect institutional lenders engaged only in providing long–term home mortgage financing and not lenders primarily engaged in consumer or other areas of financing but who take security interests in a residence or homestead to secure non–home financing debts.

■■■ In the instant case, it clearly appears that the plaintiff is not engaged in long–term residential financing. It also clearly appears that, in addition to the mortgage taken, an assignment of a life insurance policy, including any unearned premiums, was taken for the stated purpose of additional security. The assignment doc-

ument itself is entitled "Assignment of Life Insurance Policy As Collateral" and clearly specifies that the "assignment is made and the Policy is to be held as collateral security for any and all liabilities . . . to the assignee . . . ." Under these circumstances, the exception to § 1322(b)(2) is manifestly inapplicable.

Even if the exception to § 1322(b)(2) was applicable and the security consisted only of the debtor's principal residence, § 1322(b)(5) with respect to the curing of defaults expressly applies notwithstanding the exception to § 1322(b)(2). Section 1322(b)(5) is a statutory codification of the practice developed under former Chapters XI and XIII wherein the injunctive power of § 2a(15) was sometimes utilized not to modify the rights of a creditor but to postpone his remedies upon reasonable and equitable terms and conditions in aid of a worthy rehabilitation plan. See, e. g., *Hallenbeck v. Penn Mutual Life Insurance Co.*, 323 F.2d 566 (4th Cir. 1963); *In re Garrett*, 203 F.Supp. 459 (N.D.Ala.1962).

The injunctive power, which is now embodied in § 105 of Title 11, is still available in appropriate cases to prevent foreclosures. However, it is now usually unnecessary to consider § 105 in Chapter 13 cases inasmuch as the provision permitting the curing of defaults within a reasonable time in or by a plan provides the same relief formerly available by way of injunctions conditioned upon the curing of default within a reasonable time.

Finally, mention must be made of the entry of the court's order on July 29, 1980, some four (4) days after the expiration of the time inadvisedly and arbitrarily sought to be imposed by the drafters of Interim Rule 4001 under the guise of purporting to fill a gap left by the provisions of § 362. There is no gap to be filled. The impracticality of such a rule is no more apparent than in a case such as this where a district has only a single judge who by emergency was unexpectedly called away by reason of a family traffic fatality. The invalidity of such a rule has been forcefully articulated in *Vlahos v. Pitts*, 2 B.R. 476, 5

B.C.D. 1129 (Bkrtcy.C.D.Cal.1979), the sound reasoning and logic of which is adopted in this district. See also, *First Mortgage Corporation v. Walker*, 3 B.R. 213, 6 B.C.D. 161 (Bkrtcy.W.D.Va.1980).

The court having entered the foregoing opinion, the parties shall seek the prompt scheduling of such rehearing and further hearings as are necessary to consider further the matters to be determined in these proceedings.